**UNITED STATES, Appellee,**

v.

**Specialist Michael A. PERI, 559–75–8148, United States Army, Appellant.**

**ACMR 8902052.**

U.S. Army Court of Military Review.

26 Nov. 1991.

For Appellant: Leonard R. Plotrowski (argued), Major Michael J. Kelleher, JAGC, Captain Holly K. Desmarais, JAGC, Captain Gregory A. Gross, JAGC (on brief).

For Appellee: Captain Robert J. Walters, JAGC (argued), Colonel Dayton M. Cramer, JAGC, Major Joseph C. Swetnam, JAGC, Major Thomas E. Booth, JAGC, Major Paul E. Jordan, JAGC (on brief).

Before NAUGHTON, HOWELL and JOHNSTON, Appellate Military Judges.

## OPINION OF THE COURT

HOWELL, Judge:

The appellant pled guilty to absence without leave (AWOL), violation of a lawful general regulation, espionage, and wrongful appropriation (two specifications), in violation of Articles 86, 92, 106a, and 121, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 886, 892, 906a, and 921 (1982, Supp. III 1985), respectively. A general court-martial composed of officer members sentenced the appellant to a dishonorable discharge, confinement for thirty years, forfeiture of all pay and allowances, and reduction to Private E1. Pursuant to a pretrial agreement, the convening authority suspended the confinement in excess of twenty-five years for a period of three years and otherwise approved the sentence.

Before this court, the appellant has assigned three errors through counsel. Generally, the appellant contends that his guilty plea to the espionage charge was improvident; that the sentencing instructions given by the military judge to the court-martial panel were prejudicially erroneous; and that the sentence was inappropriately severe. We disagree and will affirm the findings and sentence.

## I. Factual Background

Beginning in March 1988 the appellant, an electronic warfare/signals intelligence analyst, was assigned to the Regimental S-2 Intelligence Section (RS-2), 11th Armored Cavalry Regiment (ACR), Downs Barracks, Fulda, Germany. His duties involved the processing and evaluation of intelligence information gathered by the collection, management, and dissemination section of the RS-2 shop. To assist in accomplishing his work, the appellant possessed a top secret security clearance with access to compartmentalized classified information. Additionally, he had access to the RS-2 office and the restricted areas therein, including the Sensitive Compartmented Information Facility (SCIF), the Regimental Border Operations Center, and adjacent areas.

On 20 February 1989, a Monday holiday for the American forces in Germany, the appellant returned to his unit at Downs Barracks from a weekend visit to see a friend. As he later related to the military judge, that day he was upset by "problems and pressures" at his unit, and decided to cross the border into East Germany, "to just leave everything behind here and start over." According to the Stipulation of Fact (Prosecution Exhibit [P.E.] 1), during the afternoon of 20 February the appellant withdrew most of the money from his savings account. Sometime later that day he entered the SCIF at the RS-2 office and removed two computer floppy discs (P.E. 33 and 34) from a co-worker's area. Each disc contained information classified and marked as "Secret." Prosecution Exhibit 33 (Annex B to the 11th ACR General Defense Plan) included a detailed discussion of the enemy's combat units, artillery, air support, air assault, air defense, and capabilities to attack under various timelines; an estimate of the enemy's most probable courses of action; and a listing of the advantages and disadvantages of terrain and weather as these factors would affect U.S. and enemy combatants. Prosecution Exhibit 34 (Annex F to the 11th

ACR General Defense Plan) described in great detail the priorities of U.S. electronic warfare operations against attacking enemy forces. After removing the classified "floppies" from the SCIF, the appellant placed these and two other system discs into a computer carrying case along with a laptop computer and an external disc drive that belonged to the RS–2 shop.

During the providence inquiry, the appellant told the military judge that he knew the discs from the SCIF contained Annexes B and F of the General Defense Plan when he obtained them. He planned to take the discs to East Germany and use them as a form of insurance to gain acceptance from the East Germans. He explained to the military judge that "the main reason for the discs were in case I wasn't accepted on the other side. It was a bargaining chip."

On the evening of 20 February, at the appellant's suggestion, he and two of his roommates went to dinner at a restaurant in Fulda. After dinner the appellant suggested that they go to a nearby mall for dessert. Although he told his roommates that he would meet them at the mall, the appellant instead went to his car and immediately drove to his barracks. He packed a sport bag with personal effects, walked to the ACR Command Group parking area, and placed the bag inside a High Mobility Multipurpose Wheeled Vehicle (HUMMWV). Still dressed in civilian clothes, the appellant then entered the ACR headquarters building, filled out a false vehicle dispatch form, and picked up the HMMWV keys. According to the stipulation of fact, he intended to use the HMMWV to gain access to the interzonal border between West and East Germany, since he did not have a border pass authorizing his presence in that area. During the providency inquiry, the appellant explained to the military judge that the vehicle was "associated with the S-2 shop and if people working on the border saw a Headquarters 2 vehicle they would figure I had a border pass."

Once he secured the HMMWV keys, the appellant proceeded to the RS–2 office and retrieved the laptop computer, its accesso-

ries, and the floppy discs. Placing these in the HMMWV with his other gear, he drove the vehicle toward the border on the "Phantom Autobahn" (a roadway that ended just short of the border). Near the border he abandoned the HMMWV in a ravine. Taking the computer, the floppy discs, and his personal gear, he climbed the single metal grid fence, and dropped into East Germany. For two hours the appellant walked undetected along a high speed patrol road. He then spotted a guard tower manned by East German border guards and walked up to it, causing great surprise among the guards. After the guards placed the appellant in custody, they took the computer and Annexes B and F from him. They questioned him initially about how he managed to enter the country and approach the guard tower undetected. Using a map provided by the East Germans, the appellant pointed out the path he used to cross the border.

During the morning of 21 February the East Germans briefly returned the computer to the appellant. When asked what he did at that point, the appellant stated, "I checked the computer. I wanted to check it to make sure nothing was damaged on it, being a laptop and carrying it, hitting against something could just dump everything and it would be worthless. I turned on the computer and brought up one program to make sure nothing was dumped and made sure everything was working on it and then turned it back off." The document accessed by the appellant, and seen by border command authorities during his checkout of the computer, was an unclassified letter of instruction concerning the M1 Abrams tank.

On 22 February unknown officials again took the computer and software from the appellant. He was moved from the border area to a small town north of Berlin. Later examination by U.S. authorities revealed that someone accessed the computer on 22 February and printed Annex B, the Intelligence Annex to the 11th ACR General Defense Plan. In response to the military judge, the appellant denied accessing Annex B or F while he was in East Germany, but he acknowledged that certain indi-

viduals, presumably intelligence officials, asked him if he knew anything about the annexes. "They ask me if I knew anything about Annex Bravo. All I could tell them was that it had to do with weather, avenues of approach and terrain. They ask me about Annex Foxtrot. I didn't know anything about Annex Foxtrot, but knowing that it—what is in our vault, it had to do something with the intelligence field."

While he was in East Germany, the appellant signed a declaration stating that he was not interested in getting in touch with the U.S. authorities. When offered the option, he decided to leave East Germany and go to Austria, and signed a second declaration to that effect. On 3 March, prior to his departure for Austria, the computer, its accessories, and the software were returned to the appellant. He remained in Austria only one day. On 4 March he traveled to Fulda and voluntarily surrendered at his unit headquarters.

According to the appellant, his actions on 20 February 1989 and thereafter resulted from his displeasure at certain work policies and decisions by his chain of command. He denied any ideological motivation, and told the military judge that he chose East Germany only because it was "the closest point to leave."

II. Providence of Plea to Espionage

To prove espionage, it must be established that the accused

"communicated, delivered, or transmitted any ... information relating to the national defense ... to any foreign government ... or military ... force within a foreign country ... either directly or indirectly; and [did so] ... with the intent or reason to believe that such matter would be used to the injury of the United States or to the advantage of a foreign nation."

Manual for Courts–Martial, United States, 1984, para. 30b(1) [hereinafter MCM 1984].

In his first assigned error, civilian appellate counsel contends that the appellant's plea of guilty to espionage was improvident because he never admitted an essential element, that is, "delivery" of the defense information in question to the East Ger-

mans. Counsel argues that during the providence inquiry the appellant brought out matters regarding "delivery" of the information which were inconsistent with his guilty plea, and that the military judge never resolved these inconsistencies. Counsel's argument rests on two key premises. First, the appellant told the military judge that he did not *offer* the information to the East Germans. Rather, the border guards apprehended the appellant and then *took* the computer and software from him. Second, the appellant consistently maintained throughout the providence inquiry that he only intended to use Annexes B and F as a "bargaining chip," and then only if necessary to improve his position in East Germany. Moreover, he never acknowledged actually using the information for such a purpose.

According to civilian appellate counsel, these responses reveal that before the appellant "formed the intent to commit espionage," the East Germans took the computer and software from him. Counsel argues further that, for the offense of espionage to be complete under the circumstances of this case, there must be evidence that the appellant, of his own volition and intention, affirmatively handed over the defense information to the East Germans. Otherwise, no "delivery" within the meaning of the statute occurred. Accordingly, since the plea inquiry failed to establish a "delivery" consistent with this interpretation of Article 106a, UCMJ, counsel contends that the military judge should not have accepted the plea of guilty to espionage. However, we must reject the defense view because it misinterprets both the nature of the criminal intent required and the proof necessary to establish "delivery" under Article 106a.

In this case the military judge advised the appellant of his rights and ensured that his pleas were voluntary. Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial [hereinafter R.C.M.] 910(c) and 910(d). Further, he properly advised the appellant of the elements of the charged offenses. *United States v. Care*, 40 C.M.R. 247 (C.M.A.1969); R.C.M. 910(e). Before accepting a guilty plea, however,

the military judge must make an inquiry of the accused which satisfies the judge that there is a factual basis for the plea. R.C.M. 910(e). The plea may be accepted only if the factual circumstances revealed by the accused objectively support the plea. *United States v. Davenport*, 9 M.J. 364 (C.M.A.1980). The plea must be rejected if the accused sets up matters inconsistent with his plea. Article 45(a), 10 U.S.C. § 845(a); *United States v. Logan*, 47 C.M.R. 1, 2 (C.M.A.1973); *United States v. Penister*, 25 M.J. 148 (C.M.A.1987). These mandates require that, if an accused raises matter inconsistent with his guilty plea, the military judge, *sua sponte*, must inquire further into the providence of the plea. If, after such inquiry, the military judge believes the plea is improvident, he will enter a plea of not guilty on behalf of the accused. Article 45(a); *United States v. Clark*, 26 M.J. 589, 592 (A.C.M.R.1988), *aff'd* 28 M.J. 401 (C.M.A.1989).

■ After a careful review of the record, we conclude that the appellant's replies during the providence inquiry did not in fact raise matter that was truly inconsistent with his plea of guilty to espionage. *Logan*, 47 C.M.R. at 2. During the providence inquiry, the appellant described how he intentionally took the computer and floppy discs from the RS–2 office by surreptitious means. He then clandestinely transported the classified software into East Germany, together with a laptop computer to ensure it could be accessed. After wandering for two hours unchallenged in East Germany, he sought out the East German border guards and revealed himself to them, knowing that they were potential enemies of the United States. Under these circumstances, we believe that the appellant's conscious, voluntary act of conveying the defense information across the border and then intentionally delivering himself and the information into the custody and control of the East German military authorities constituted a "delivery" within the meaning of UCMJ art. 106a.

With respect to civilian appellate counsel's "bargaining chip" theory, we believe that this argument confuses the appellant's motivation for taking the information to East Germany with the *mens rea* required to satisfy the elements of UCMJ art. 106a. Government appellate counsel contends that the appellant's replies to the military judge satisfied the "delivery" element of the offense, even though the conveyance did not occur in the course of bargaining. We agree. There are numerous ways the "delivery" could have occurred. The appellant's plea is not vitiated simply because that delivery took place in a manner he did not initially envision.

Government counsel argues further that the appellant had the requisite criminal intent needed to satisfy UCMJ art. 106a since he had reason to believe the defense information would be to the advantage of East Germany. We agree and note further that throughout the providence inquiry the appellant consistently acknowledged a continuing intent to use the information to obtain his goals in East Germany. Indeed, his general criminal intent is further illuminated by his subsequent actions, including ensuring the computer was still working properly when it was returned to him on 21 February, accessing the tank letter of instruction, and describing the contents of Annexes B and F for the East Germans. All these actions indicate the appellant's continuing intent to use the information for his own personal ends by cooperating with the East Germans.

■ The espionage charge alleged that the appellant wrongfully communicated, delivered, or transmitted information relating to the national defense to the East Germans. Since this element of the charge is stated disjunctively, the appellant's admissions during the providence inquiry must establish at least one of these three means of committing the offense, but need not establish all three. Nevertheless, in our view, all three means were established in this case. During the providence inquiry, the appellant described how he accessed the tank letter of instruction in the presence of border command authorities. Additionally, he related having generally described the contents of Annexes B and F in response to questions by East German

**932**

officials. We conclude that these actions independently establish a "transmittal" and a "communication," respectively, within the meaning of Article 106a.

While the military judge's inquiry was not perfect, it was adequate. While he perhaps should have defined the words "communicate," "deliver," and "transmit" during his explanation of the elements, his failure to do so did not hamper the appellant's understanding of the elements. Moreover, his inquiry, coupled with the stipulation of fact, clearly established the accuracy of the plea. Notwithstanding the "bargaining chip" testimony, no matter was raised that was truly inconsistent with the appellant's plea of guilty.

### III. Sentencing Instructions/Sentence Appropriateness

In his remaining assignments of error, civilian appellate counsel challenges certain sentencing instructions and further contends that appellant's sentence was inappropriately severe.

At the conclusion of the sentencing instructions, the trial defense counsel requested the military judge to clarify two instructions, including the instruction on the appellant's unsworn statement now challenged by the appellant. The military judge granted the requests and subsequently re-instructed the court on both matters to the satisfaction of the defense. Additionally, before the military judge com-

pleted instructing the court, the civilian defense counsel requested clarification of an instruction concerning the purposes for which a *Time Magazine* article could be considered. Again, the military judge granted the request. There were no additional defense requests for clarification or objections to the instructions given to the court.

■ After examining the judge's instructions, we find no error. We note that in the absence of timely defense objection at trial, the appellant waived appellate consideration of the sentencing instructions he now challenges. R.C.M. 1005(f); *United States v. Fisher*, 21 M.J. 327 (C.M.A.1986).

■ Turning to a consideration of the sentence, after a careful review of the record of trial, we find no merit in the appellant's assertion that his sentence is too severe.

Accordingly, the findings of guilty and the sentence are affirmed.

Senior Judge NAUGHTON and Judge JOHNSTON concur.